Good morning, Your Honors. May I please the Court, Deputy Attorney General Conrad Schroeder on behalf of the Appellant, Warden Don Davison, and I'd like to reserve two minutes for the timekeeper. We're here today because the District Court erred in three very fundamental ways. First, improperly applied to some evidence standard, finding that there is a federal liberty interest in due process. Secondly, if Superintendent Vigil and some evidence standard applies, they improperly reweighed the evidence in great detail. And third, they improperly applied Biggs v. Terhune, the dicta from that case, which has been since be found to be not clearly established federal law. Now, the first argument might meet with some incredulity, given the Court's recent holdings on Superintendent Vigil. But the Appellant would like to direct the Court to look at Kerry v. Musladen case, which clarifies and narrows clearly established federal law and what that means. In the Musladen case, we had witnesses or victims' family in the courtroom who had buttons made with the victim's likeness on it in the court. And the State Court found that that did not create an inherently prejudicial atmosphere in the courtroom. The District Court, actually when it got to the Ninth Circuit, this Court, they found that that was inherently prejudicial, looking at Supreme Court precedent that talked about State behavior that's inherently prejudicial. Looked at two Ninth Circuit cases, too. That's correct, Your Honor. Excuse me, Your Honor? Our Ninth Circuit decision was based on two Ninth Circuit cases interpreting the U.S. Supreme Court decision. That's correct, Your Honor. And that's basically the difference between Musladen or what Musladen points out is when the U.S. Supreme Court reversed this Court in that matter, is that there was a difference between State action that was inherently prejudicial and personal action that may or may not be prejudicial. And the U.S. Supreme Court found that it had to be a tight fit. It had to be the same issue. It just can't be the sort of same area of the law. I thought the U.S. Supreme Court said we can't follow Ninth Circuit decisions. We have to follow U.S. Supreme Court decisions. Well, it said that, too, Your Honor. State court has to follow U.S. Supreme Court decisions, doesn't have to follow Ninth Circuit decisions. Well, it just depends on whether it's clearly established federal law. I thought they went off on that phrase, as established by holdings in U.S. Supreme Court decisions in 2254. That is correct, Your Honor. 2254 does apply here. It has to be whatever we're talking about here. It has to be state court decisions that were run afoul of the clearly established federal law, which would be holding of the United States Supreme Court part of a holding and not the dicta. So one of the issues with Superintendent v. Hill is that is a disciplinary hearing. That's an adversarial process, as opposed to a parole hearing like we had in Greenhalghs, which in parole hearings, that's a non-adversarial process. So using the sum evidence standard, that's a standard for an adversarial process, as opposed to an administrative process in which it's. . . What do we do with Irons? What do we do with Irons? Irons is a good question because Irons has created a great amount of confusion in the district court because Irons rejected the Biggs dicta and basically went forward and denied, you know, denied the petition or found that. . . Well, in SAS, of course, in SAS and in Irons, the Biggs dicta was rejected. And in both cases, they found that the board had acted correctly and that Biggs was not clearly established federal law. They didn't make it as clear. But on the liberty interest claim, they take a different. . . Well, it was very clear on that. And what I'm asking or what the respondent is asking. . . It's hard for us as one panel to completely ignore another panel. I thought that the mandate had not yet issued in Irons. Has it issued? I'm not sure, Your Honor. That wasn't my case. And I'm not sure if it's actually come down in the last few days. I understand that a rehearing has been requested. But as far as the federal liberty interest parole argument, the respondent would like the court to just reexamine the slot and see if they want to, if the panel would like to come to a different result and maybe this is something that needs to be resolved by an en banc panel. You're saying the some evidence test should not be used. It should be Greenholds, Your Honor. It should not be some evidence. Because under Greenholds, it's basically a hearing and then reasons for denial. Because it's not an adversarial hearing. Although I understand that's not what the court has recently found in Irons. But if it is the some evidence standard, is there some evidence here? That's what I wanted to get to. That's the second argument. In this case, there is some evidence. What is the some evidence? The some evidence, Your Honor, is there is evidence of premeditation. In fact, she took a gun. She armed herself. She stalked these victims, showing great premeditation. She followed them around. She made threats. I mean, this is all her own admissions. Could I capsulize that and say it's the gravity of the offense? It's the gravity of the offense. But there are subparts to the gravity of the offense under California law. And one is the premeditation factor. She was convicted of second-degree murder. But there was also. You say there's some premeditation. There's some evidence. That's your view of it. That should be enough, Your Honor. But we also have multiple victims here, which is another part of the California test. You have multiple victims. So it should be a first-degree murder, and it's multiple victims. And instead, she's gotten concurrent sentences for second-degree murder. Is it 15 years or 17 years? It's 17 years, Your Honor. I know it seems a little confusing on abstract of judgment. It actually said 22 years. But it should be 17 years because it's. I thought that different numbers there. So based on the circumstances of the crime. That's correct, Your Honor. She could spend the rest of her life in prison. It depends on the board and the board's judgment, Your Honor. She could, though, just on the circumstances. And she's been turned down nine times? I don't have that information in front of me. She has been turned down more than once. But that's your basic position, is that she could basically get a life without parole. It's a possibility, but that depends on the judgment of the board, which under Greed holds. But under your position, the board could. The board just could continue based on the circumstances of the crime, even despite her record in prison and her accomplishments and whatnot. That's a possibility. They could say, you know. Your Honor, they're entitled to do that. Whether they do it or not remains to be seen. Is there something sensitive about this? I mean, two cold-blooded murders, is there a problem keeping somebody locked up for life? I don't think so, Your Honor. I mean, if the board thinks that. Even if they behave nicely in jail? It's a possibility, Your Honor. But it's something that's within the discretion of the board. Because California isn't even required to have a parole system. And under Greed holds, we really, California, like all the states, are encouraged to have a parole system and tinker with it and do the best they can under the circumstances. It says parole shall be granted unless, doesn't it? But the unless is the kicker. Because under California law, rehabilitation is not the primary goal. And I think that that's where the original irons in the district court, and Biggs got it wrong, is they're putting rehabilitation before public safety. When under California law, under the penal code, in all the cases, the number one priority is public safety. And that comes down to the board. Because the board sits in the room with her. They're the only ones. The court hasn't had the opportunity to sit there and examine her in person and look at her entire prison central file and make that judgment. They're the ones that have to make the call in the end. And they're the ones that have to live with it. And they're the ones that are trained to evaluate everything that happens. What could she do? I don't honestly. What could she do? What could she do is all within the Title 15, which is California's regulations that deal with parolees, and how she could prepare herself in order to get a parole date. But you read with the transcript of the hearing, and they heap praise on her for her time in prison. And they say, you know, just continue on. But what do you do? The Superior Court judge didn't give her a life without parole sentence. That's correct, Your Honor, but it's life. You know, the state didn't have to compromise. The state could have gone for the mass, you know, two killings. Well, that's a separate issue, Your Honor. That's whether there was prosecutorial laziness or how the situation was solved that she got the sentence that she did. But it is life. The upper end is life. It's not a minimum of 15 years. Does there have to be something that she can do? I mean, does she have a right to get out by doing something? No, she does not, Your Honor. She does not have a right to any sentence less than the maximum, which is life. Tell me if I've got this conceptually right. The Supreme Court has said in Greenholz, she's entitled to an opportunity to be heard and to be told why she was denied parole. Being told why could be because you committed a really bad crime years ago. Yes, Your Honor. And then our court has said there has to be some evidence, in addition to committing a really bad crime years ago that you were convicted of, for keeping you in, for denying you a release date. But then Ms. Lawton said the state only has to follow holdings of the U.S. Supreme Court. It does not have to follow holdings of the Ninth Circuit. Have I got this conceptually right? I think partially you have it conceptually right, Your Honor. The only thing, the problem I see with that is where you said that the Ninth Circuit has found that it has to be some evidence beyond the commitment offense. The state has not found, I mean, this court has not found that it has to be some evidence beyond the commitment offense. It can be the commitment offense. And in looking at Superintendent V. Hill, it's a modicum of evidence. It's very little. The court is strongly discouraged from reweighing that evidence. And looking at the district court ruling in this case, there's just pages and pages and pages of reweighing the evidence and trying to say, well, was it really deliberation or was it an emotional act? And this is not the province of the federal court to interfere in these types of decisions and reweigh every parole hearing. Otherwise, we could be here for every single life or inmate and have to have evidentiary hearings before the court to try and decipher what the board is already doing. I think we are. But which is the Ninth Circuit case that you think is the right interpretation of what some evidence means? That would be Superintendent V. Hill. Hill. And that one, and also Toussaint, which is cited in the papers. Are there any other cases pending in the circuit? There are cases pending as far as this exact issue, Your Honor. I'm sure that there are. However, I think I have argument on one in about a month in a case called Mosby, which is one in which we prevailed on in the district court. Why should we even care what the Ninth Circuit cases say after Ms. Lawton? Your Honor, all they really, the Greenholts is the proper standard, a hearing and a reason for denial. We had a big go-round on Ms. Lawton, dissent from denial, whole works. And I thought that's what it settled. It seems to us, Your Honor, it seems to the respondent, excuse me, to the appellant, that this is a case in which it is pretty clear they're entitled to a hearing and a reason for denial. And the some evidence standard is for an adversarial process. And in this case, it went even beyond what the standard has said, has been claimed to be in the Ninth Circuit. So under Greenholts, it's enough they listen to her  That is correct, Your Honor. Was Ms. Lawton briefed to the Irons panel? That I do not know, Your Honor. Oh, was it briefed to the Irons panel? I believe it was, Your Honor. The same argument was made to the Irons panel. I don't know if it was in great detail, but I believe it was raised. And it was also raised in Conkler, which is an unpublished decision that came out the day after Irons. But one of the things that's very useful about Irons is, as all these recent cases, Sass, Irons, and the unpublished Conkler, is they reject the bigs dicta. And the only problem with those rulings is they haven't been very clear as to say exactly that this is not clearly established federal law and that the district courts should not be following it. And in Irons, they even created further dicta, in which they discussed whether somebody served a minimum term or not. However, in the day after Irons, a different panel came forward and found that whether somebody made the minimum term or not is really not an issue. Because in Conkler, he had served 20 years of a 15-year-to-life sentence. And that was for killing one person, not killing two persons. So it looks like I'm over my time. So if I can reserve anything for the panel. I like to call on people for 30 seconds, as you've noticed, just so that the athlete doesn't know he's got a free shot with no rebuttal coming. Thank you, Your Honor. Good plan. Good morning, Your Honor. Stephen Lubliner on behalf of Appellee Cheryl Culverson. It should not escape the Court's attention that in arguing that the sum evidence standard does not govern this case, the Attorney General is essentially arguing that arbitrary and capricious decision-making can be the standard in a case where it is conceded that the due process clause applies. Counsel, I'm having trouble understanding the argument. Where I start is the statute. And in 2254d1, it says, clearly established federal law and then has a phrase following the comma, as determined by the Supreme Court of the United States. We had this line of decisions about how people behave in the courtroom that led to the button decision in Masladen, no buttons. The Supreme Court had not said no buttons. We had. There was a dissent from denial of rehearing en banc. The Supreme Court took it. And they said, no, no, that part of the statute that says, as determined by the Supreme Court of the United States, that really means something. And what's more, it has to be holdings. So I don't really see why we have to pay any attention to Ninth Circuit decisions that say any more than Greenhalghs. And Greenhalghs, it seems really solid. It says there's nothing in the due process concepts on page 15 of Greenhalghs that requires the parole board to specify the particular evidence in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. So that seems to reject the notion that they have to misbehave in prison or there has to be something more than the fact that they got convicted years ago of a bad crime. It just doesn't seem to be there. So we can go one way. California can go another. And on habeas from California, we have to follow the Supreme Court, not our own decisions. I don't get where there's any more to it. Well, two responses, Your Honor. First, as far as Ms. Lawton goes, Ms. Lawton did not deal with the language in Williams v. Taylor, which says that it can be a violation under 8 before a state court to unreasonably refuse to extend a Supreme Court principle to another context where it logically applies. Now, one thing that was interesting in Ms. Lawton was that in reaching their own result, they noted, although obviously it wasn't dispositive what lower courts did, that there was a lot of confusion amongst the circuits about whether or not this particular Ninth Circuit test should apply. They went further than that. They said, actually, it might be a really bad idea for a judge to allow the buttons in the courtroom. Nevertheless, we hadn't said so, so habeas can't be granted on that. Right, but there is no similar confusion here. And I would submit that conspicuous by its absence from the Attorney General's showing is really any case that supports the notion that a government decision that can be reviewed under the Due Process Clause can be arbitrary, capricious, and not supported at least by what we are conceding. That's tautological. No discretionary government decision can be arbitrary and capricious. But what's arbitrary and capricious about saying, well, to Sirhan, Sirhan, look, you've been a good boy ever since you murdered Robert Kennedy, but that was a really bad crime, so we're not going to let you out. Well, on the gut level, nothing. And I want to get to later how the gut level doesn't control. Now, under the Attorney General's view of something not being arbitrary and capricious, I submit that that's what they're advancing. And if you read Greenhalgh's to say we don't have to look beyond the face of the decision as long as someone was handed a piece of paper, then you're endorsing potentially arbitrary and capricious decision-making. Only if the reasons given are arbitrary and capricious. What's arbitrary and capricious about saying you've been real well behaved since you've been institutionalized, but your crime was just really bad? So we're not going to let you out at the bottom end of your partially indeterminate sentence. Maybe later we'll change our mind. Really bad is not the standard that California has enacted, and I want to get to that. We don't have any say over the standard that California has enacted. All we can do is decide whether California has violated Supreme Court holdings. Well, we're looking at two separate questions. We don't get to the question of whether there's some evidence to support what California did, whether there's any logical federal review applying the same standard that California applied in reviewing the board's decision until we decide that there is a right to have the some evidence standard apply. Now, if Ms. Culverson had been given a denial that said, we deny parole because of your numerous records of disciplinary infractions during your lengthy incarceration, the attorney general would say, well, she got a statement of reasons, and that ends the issue. But we know Ms. Culverson does not have any record at all of infractions in prison. And I submit if we look at the language in Greenhalghs, notwithstanding what the court read, a piece of paper is worthless unless you can go behind it to some minimal extent to satisfy yourself that it's not arbitrary. But doesn't the California rule actually say that the board can rely on the gravity of the offense as a reason for denying? The rule speaks of the prefatory part of the regulation speaks of the gravity of the offense. And there is a lot of loose language in the opinions at the state and federal level that speak of callous disregard for life, aggravated murder, which was the language recently in Kunkel versus Muntz, minimum elements particularly egregious, and so on. But if you look, but I would submit that the particular adjudicator, the board member or the court's personal revulsion, the oh, my God, how could she do that reaction to the crime is not the standard. So under your theories, if they've been model prisoners, Sirhan, Sirhan and Charles Manson have a legal entitlement to get out. No, that's well, we have to go through the regulations that the board is entitled, is required to apply. And the California Supreme Court, though they use some loose language themselves, like I just described, in the Rosenkranz case and in the Dannenberg case, they make this clear that the question is some evidence based on the factors specified by statute and regulation. The governor's discretion, and that was on page 658, on page 660, the governor's discretion must be based on the factors that restrict the board. Dannenberg, to the same effect, page 1080, detailed standards and criteria, resuitability. And in Dannenberg, the question before the court was really not just how do we figure out what some evidence is. The question before the court was the interplay between suitability and uniform terms. Page 1095, the board must apply detailed standards, and the California Supreme Court, as the Court of Appeal had done, applied those factors. They applied and relied on the human suffering and the trivial motive factor. So the question here is the case-specific inquiry going down each and every finding factor of suitability. That sounds like reasons. What's the matter with that? I'm sorry. That's reasons. They have to give reasons. They can't be arbitrary and capricious. They gave reasons. And the reasons have to be supported by some evidence. Just as in my example, if the denial had been, well, she has a horrible record in prison. We know she doesn't. How could that not be a due process violation? The reasons here were not a horrible record in prison. She's wonderful in prison. She's taken anger management. She teaches anger management. She's learned to deal with a broken heart, I think she said. Good stuff in prison. The reasons they gave had to do with the crime. Cold-blooded, two victims, premeditated. And why isn't that reasons? Well, I will go down the list. Premeditation, I would submit, is not a reason. The Attorney General focuses on premeditation. I kind of take a different view than Justice Moreno's dissent in Dannenberg. I think the applicable regulation recognizes the fact that cases are going to come before it. They're going to be first degree. They're going to be second degree. And they cut to the chase and they say, let's look at what actually happened. And none of the factors for unsuitability sets out premeditation as an example of something indicating unsuitability. The regulations presume that first degree murderers and second degree murderers can be found entitled to parole. Now, the precise question beyond other than the gosh, is that nasty or is that not nasty question that has to be answered was, does the inmate pose an unreasonable risk of danger to society if released from prison? And that answer has to be evaluated. Was the board's answer supported by some evidence having some indicia of reliability? Restated, I think reasonably, without exaggeration, the question that the parole board is supposed to answer is, was this crime an aberration or does this person have a kind of criminal or homicidal disposition? And if you look at the factors of unsuitability, it's the commitment offense. Was the commitment offense especially heinous, atrocious, or cruel? Other fact that suggests a criminal disposition, someone who's maybe in love with killing. The other unsuitability factors, prior record of violence, unstable social history, this person's not functioning, sadistic sexual offenses, severe mental illness related to the crime, this person can't function, poor institutional behavior, this person won't function. Now, the factors in favor of suitability are factors that suggest this crime was an aberration. So you're saying we should just reweigh all that? No, I am saying you need to look at the evidence that was in the record and say, given there was all this evidence of suitability, and at most, the only potential factor of unsuitability is the fact that she killed two people, and have to. Only? No. Well, only. That's not a big deal? It's a horrible. Every murder is a big deal. And I would, as we have this discussion, I would like the attorney to. I mean, what if one of us had a sister or a daughter or a friend who got involved with this woman after she got out? You'd be kind of nervous. Absolutely. And the reason you'd be nervous is that despite all the wonderful things in prison and teaching anger management and stuff, look at what she did to her last time a lover jilted her. She killed two people. But I would like the attorney general, or perhaps your honor, to tell me, so can we define the terms of the debate? What is the archetypal model? The rehabilitation side is great. What's the fact pattern that says there would not be some evidence to support denial of parole based on a commitment offense? I never hear that. By this thinking, I should send my kids to a summer camp directed by Adolph Eichmann and not worry about him because he's behaved ever since. It's a long time ago. It's not a question of behaved ever since. I think Eichmann probably goes down a lot of other factors of poor uncertainty. I don't know. I heard he was a wonderful fellow after 1945 until he got caught. Well, the only factor is not the only factor to look at here. He probably said he was a wonderful fellow after he got caught. But there's still that history. Yes, there is still that history. And I submit where you have someone who's shooting up malls, where you have the fellow at Virginia Tech, you can't answer that, you wouldn't be able to answer the mental illness question right. But we are answering, excuse me, all the suitability factors factor into her favor. The only thing, and I know it sounds horrible to say only, Your Honor. I just don't see how you get past Greenhalgh's. In which respect now? Quote, there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. Quote, quote. Well, no. Well, it's settled law in this circuit that under Greenhalgh's, a prisoner has a liberty interest in parole that is defined by the California statutes, just as state law defines many other due process interests that are not necessarily enshrined in the Constitution. We've probably gone back and forth enough on this. I should give my colleagues a chance to ask questions. If not, we're out of time. Are there any other cases pending in this circuit? I spoke to an attorney who had represented Mr. Rosenkranz, who has since been granted relief in federal and state court and is now out. He argued a case, I think he said the name was Smiley, recently, that's pending. That was from a, he was the appellant, I believe, in that case. Smiley. I think that was the name. Okay. I'll check. Okay. Thank you, Your Honor. Thank you. Just as a final thought, the district courts in the Ninth Circuit have seemingly developed quite a bit of confusion about these issues. In following, on one hand, following the prior Ninth Circuit precedent in Superintendent Vigil and also going off on a tangent on the Biggs v. Terhune stuff. And now, at this point, after Irons and the minimum term language, most of the district court judges are asking for supplemental briefings to discuss Irons. And it seems to the respondent that this is something that really needs to be resolved at a very fundamental level. And the court seems to be, you know, going towards the greenholts, which the respondent believes is the correct direction to go in these cases. But as far as that, Irons, and Biggs, we feel that the district court. Well, I'm not sure. I mean, I think we do have, you know, I'm not, I haven't really thought this through yet completely, and I don't know quite how I'm going to come out on this case. But we do owe, you know, we are, we do have certain principles that apply. If an earlier panel has made a ruling, I still think we owe some. We can't, we're not just free to say. We're not going to, we're just going to disregard what you said. We have an obligation to call it en banc or to do something. I understand that, Your Honor, and that's the reason why I've gone into a great amount of detail in discussing the sum evidence. That's a different question once you get to the sum evidence standard, once you're applying it. Which I feel, which the respondent, it's the respondent's position that there's really quite a bit more than sum evidence in looking at the loss of two human beings. Because under California law, a crime is sufficiently egregious if it's, you know, there's a bunch of different things. There's, you know, multiple victims, which we have here. We have the deliberation and preparation, which was a big thing in the original Rosencrantz. And we also have the triviality of it, of somebody that killed two people because she felt humiliated that they were moving on or laughing at her or whatever she claims. And the evidence that supports those factors is her own testimony at the hearing where she discusses what happened. And she doesn't really deny it. When did she come up for another hearing? That I don't know, Your Honor. I imagine she must have. Did they bring her up under their rules pretty regularly? I believe this was a one-year denial, so once. That was a one-year denial. It was a 203, so. Right. So she probably received another hearing, but that's not before the court. And I didn't look that up before I came in. So I really, I just. Counsel, I'm a little confused about the reference to Hill. Superintendent versus Hill was about good time credits rather than parole. And I had understood that good time is as long as you behave in prison, you automatically get the good time subtracted from your time to serve. It's an entitlement, while parole is entirely discretionary and is not good time at all. Am I misunderstanding that? No, Your Honor. You have it pegged. That's also the issue of because, you know, good time credits is something that you maybe have a liberty interest in parole. I mean, excuse me, not a liberty interest in parole, but a liberty interest in securing and getting that good time credit. When you lose it, there's due process that's involved. I mean, it's an adversarial process with the right to cross-examine and all other different. When you get sentenced to 20 years federally, of course, there's no parole, but there's 19 times 58 days of good time. So you get 38 months off your 20-year sentence, and you're entitled to that. You're entitled to get out in 17 years. That's what I thought good time was. It's separate. Really, when you look at Superintendent v. Hill and its application to the parole process, it's really apples and oranges. What's the confusion about Hill? I think that the court, it was pre-Kerry v. Muslott, and I think that the court was reaching for something to use as a standard in order to address this. Because there is sort of, some people believe that it's arbitrary and capricious that someone could serve life in prison for killing two people. And as a respondent's position, that's not particularly arbitrary and capricious, that someone would actually serve their life for killing two human beings. I mean, there is a possibility and circumstances where that would be reasonable, and that's up to the board and under state law and under the state scheme. Thank you, counsel. Thank you. Thank you, Your Honor. Five minutes. Culverson v. Davidson is submitted, and we will take a 10-minute recess. All rise. Culverson v. Davidson is submitted.
judges: Kleinfeld, Paez, Hart